MOORE, Judge.
Robert Dale Landers (“the employee”) appeals from a judgment of the Madison Circuit Court entered on October 11, 2006, awarding him permanent-partial-disability benefits under the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala. Code 1975 (“the Act”). We affirm.

The Issues

The employee contends that the trial court ignored undisputed evidence indicating that he was permanently and totally disabled and that the trial court erred in calculating the compensation due him.

Standard of Review

The standard of review of workers’ compensation judgments is established by Ala. Code 1975, § 25-5-81 (e), which provides:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
It is the province of the trial court to weigh the evidence for the purpose of resolving conflicts therein and making findings of fact. See Ala.Code 1975, § 25-5-81(a) & (c). On appeal, a trial court’s findings of fact based on conflicting evidence are conclusive on this court if they are supported by substantial evidence. Edwards v. Jesse Stutts, hie., 655 So.2d 1012 (Ala.Civ.App.1995). “Substantial evidence” is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)); see also Ala.Code 1975, § 12-21-12(d).

The Evidence

The evidence reflected the following. On March 2, 2004, the employee received an injury to his right shoulder while lifting an 80-pound bag of concrete in the course of his employment with Lowe’s Home Centers, Inc. (“the employer”). At the time of this accident arising out of his employment, the employee was earning an average weekly wage of $861.53. The employer paid the employee 45 weeks of temporary-total-disability benefits at a rate of $455.91 per week. The employee reached maximum medical improvement on March 29, 2005. Dr. Keith Anderson assigned the plaintiff a 9% permanent-medical-impairment rating to the right upper extremity, which translated into a 5% permanent medical impairment to the body as a whole.
At the time of the accident, the employee was 65 years old. He has a Bachelor of Science degree from Samford University in social science, and he has attended various college courses in other areas since he *147 graduated from college, including courses in sales, marketing, and home building. Before being hired by the employer, the employee sold computers and automobiles, taught school for one year, worked as an insurance claims adjuster, acted as a licensed general contractor, managed an automobile dealership, worked as a professional fundraiser, and owned and operated his own business. The employee retired between 1989 and 1992. After remarrying, however, the employee resumed working, at various times, as a salesman, a physician recruiter, a manager of a medical facility, and as an owner/operator of his own consulting business.
On November 1, 2000, the employee went to work for the employer as a sales specialist in the employer’s cabinet department. During the next four years, the employee worked for the employer as the millwork department manager and as a sales specialist in the commercial sales department.
When the employee arrived at the employer’s store on March 2, 2004, he found several bags of concrete blocking an aisle. While attempting to move one of the bags, the bag slipped from the employee’s grasp and he jerked his arm. The employee heard a pop in his right shoulder and felt an immediate pain in that area. The employee informed his employer of the injury, and the employer arranged for the employee to immediately visit a physician, Dr. Susan Lynn, who injected the injured shoulder with cortisone and restricted the employee from working.
The employee returned to work with no restrictions after a few days off. The employee worked as a commercial sales specialist for the next few months. His duties included meeting with contractors at job sites to receive material and product orders. The employee would fill those orders and sometimes actually physically deliver the ordered material and products. The employee testified that he had experienced right-shoulder pain while working but that he had rested the shoulder and recuperated on the weekends. About four or five months after the injury, however, the employee’s injured shoulder began to hurt even while the employee was sleeping, so he requested further medical treatment. The employer returned the employee to the care of Dr. Lynn, who referred the employee to Dr. John Young, an orthopedic surgeon, following the receipt of the results of a magnetic resonance imaging (“MRI”) scan.
The employee continued to work as a commercial sales specialist while seeing Dr. Lynn and Dr. Young. On November 2, 2004, Dr. Young, who had diagnosed a torn rotator cuff and a partially torn bicep tendon, performed surgery that did not resolve the employee’s shoulder complaints. The doctor took the employee off work following the surgery while the employee participated in physical therapy. Dr. Young informed the employee that his rotator-cuff tear could not be cured. Dr. Young eventually referred the employee to Dr. Anderson, a physiatrist, who had the employee undergo a physical-capacities evaluation. On March 29, 2005, the employee reached maximum medical improvement. On April 13, 2005, Dr. Young released the employee to return to work with restrictions of no lifting more than five pounds with the right arm, no overhead use of the right arm, and no pushing or pulling or repetitive gripping and grasping with the right upper extremity. Those restrictions differed from the restrictions assigned by Dr. Anderson, which basically placed the employee in the medium to heavy category of the labor market; Dr. Young explained his disagreement, and Dr. Anderson deferred to Dr. Young.
*148 The employee tried to work within the restrictions as the manager of the employer’s plumbing department, but at times he would act outside the restrictions in order to meet his customer’s needs when no one else was around. The employee requested an accommodation, so the employer returned him to working as a commercial sales specialist, which was less physically demanding.
On May 6, 2005, the employer referred the employee to another orthopedic surgeon, Dr. John Murphy, for a second opinion as requested by the employee. The employee, who is right-hand dominant, complained that using his right arm at work caused numbness and led him to try to use his left arm and hand more, even though he could not write with his left hand. Dr. Murphy had treated the employee’s father for many years and had also performed surgery on the employee in the past. Dr. Murphy diagnosed an absent rotator cuff that exposed the employee to increased arthritis and a condition known as cuff tear arthopathy. Dr. Murphy recommended that the employee limit the use of his right shoulder and took the employee off work indefinitely on June 2, 2005.
The employee took the off-work slip to the employer’s human resources manager, who assured the employee that the employer would accommodate the employee’s physical and work restrictions. However, the employee never filled out the “reasonable accommodation” form provided by the employer, according to the employer’s human resources manager. The human resources manager testified at trial that the employer could have easily accommodated the employee’s restrictions, including those established by Dr. Murphy; however, the employer never offered the employee any accommodations.
The employee testified that despite numerous conversations with the employer’s representatives, the employer never offered him any work within his restrictions. Instead, the employer placed him on a leave of absence effective May 28, 2005. This leave of absence lasted 12 weeks, during which the employee received a reduced salary. After the 12 weeks elapsed, the employee began drawing workers’ compensation benefits at a rate of $455.91 per week. The employee testified that a manager of the employer informed him on February 15, 2006, that he was no longer employed by the employer. Actually, the human resources manager testified that he had informed the employee that his health-insurance benefits had been terminated in February 2006 because of the health insurer’s rules. The human resources manager testified that the employer still considered the employee to be on leave. The employer had filled the employee’s position, but it was willing to return the employee to work in a similar position. The employee was still receiving temporary-total-disability benefits as of the time of the trial because he had not worked for the employer since June 2005.
The employee testified that the shoulder injury still affected him at the time of the trial. The employee stated that he awakes around 4:00 a.m. because of pain from his shoulder although he takes Ultram ER, a narcotic pain medication, each night when he goes to sleep around 9:30 to 10:30 p.m. He experiences pain every day, but the pain is not constantly agonizing pain that affects his ability to concentrate, it is more of a dull, aching pain with occasional episodes of “breakout” pain that requires medication. The employee testified that the surgery only worsened his pain. Once he awakens, the employee performs shoulder exercises prescribed by his therapist. He then performs routine yard work or sits around the house. He still tries to use *149 his left arm and hand to perform the ordinary activities of daily living. The employee lives off his workers’ compensation benefits and his Social Security retirement benefits, which he started drawing at age 65.
The employee testified that he could still work for the employer so long as he did not have to use his right arm and his doctors approved of the job. Dr. Young testified via deposition that he did not have any problem with the employee’s working so long as he did not lift more than five pounds with his right arm. Dr. Anderson testified via deposition that the employee could work so long as the physical demands of the job did not exceed the restrictions set out in the physical-capacities evaluation. Dr. Murphy testified via deposition that the employee could work in a sedentary position so long as he did not have to use his right arm. The employee admitted that many of his past jobs fell within those restrictions and that he could physically perform those jobs, though he later testified that he did not feel he could perform those jobs due to a combination of his age and his disability. The employee also testified that he could return to work for the employer in a job that fit his medical restrictions, but the employer had not offered him any accommodations since June 2005.
Based on the above evidence, along with the depositions of the physicians and the reports of two vocational experts, the trial court entered a judgment in May 2006 finding, among other things, that the employee was entitled to permanent-partial-disability benefits based on a 75% loss of earning capacity. The employee filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial; in response to that motion, the trial court ordered a new trial. In the second trial, the trial court accepted all the evidence presented in the first trial and heard the live testimony of the two vocational experts, Thomas Elliot and Mytrice Carr, and a private investigator.
Elliot, the employee’s vocational expert, testified that although the employee was very intelligent, he could no longer perform any of the jobs he had held in the preceding 15 years, including those he had performed for the employer, because Dr. Young and Dr. Murphy basically restricted the employee from using his right arm for work activities and all of his previous jobs required greater use of the right upper extremity. In addition, in Elliot’s opinion, the employee suffered pain that would affect his ability to concentrate on job tasks and his advanced age limited his employment opportunities because of employer bias. Based on the employee’s age, work history, work restrictions, and ongoing, significant pain, Elliot opined that the employee was 100% disabled from a vocational standpoint. Elliot felt that the employee would basically have the slightest chance of finding work and that he could not perform any gainful employment, eight hours a day, five days a week. Elliot noted the employee’s college degree and his past teaching certification, but he stated that because the employee had lost his certification and had not worked in the social science field in many years, those achievements would not assist him in locating a job. Elliot testified that even if the employee could find a sedentary job that accommodated his restrictions, the employee could not expect to earn more than $5.75 per hour, far less than the employee’s average weekly earnings at the time of his injury.
On cross-examination, Elliot admitted that if the employee had been actually employed since June 2005, then that would adversely affect his opinions. As it turns out, the employee had begun working as a *150 demonstrator at a grocery store on August 1, 2006, and had worked there for four and one half weeks, earning $7.00 per hour on an average 20-hour week. The employee quit because of the prolonged walking required for the job, which he described as temporary anyway. The employee then went to work for a building-supply company as a sales person for two days, earning $7.00 per hour, to help out the owner. The employee testified that he had applied for 25 other jobs without success.
Carr, the employer’s vocational expert, testified that the employee exhibited a superior intelligence based on her testing. Carr opined that the employee had worked primarily in light jobs involving use of the lower extremities during the past 15 years. After reviewing the employee’s medical restrictions, Carr obtained four job listings for sales and management positions for the employee through the State Employment Office. The employee’s attorney informed Carr that the employee had interviewed for those jobs, telling the potential employers that his doctors would not allow him to use his right arm, and that he had not been hired because of the potential employers’ inability to accommodate that restriction. Carr opined, that the employee’s age and experience were vocational benefits that would be attractive to employers seeking a stable employee who could draw on his logic and experience to solve problems. She considered the employee to have an excellent chance of finding a job within one of the fields covered by his past work experience. Carr maintained that the employee’s disability did not affect his primary vocational assets — his intelligence, his interpersonal skills, and his salesmanship. She opined that the employee had sustained only a 34% loss of employability because of his disability and that he could expect to earn between $713 and $998 per week.
Following the second trial, the trial court amended its original judgment to reflect that the employer had paid the employee 45 weeks of temporary-total-disability benefits and had paid the employee $6,062.68 in short-term disability benefits between June 10, 2005, and September 2, 2005. The trial court also summarized the evidence presented at the second trial. The trial court found that the employee had sustained a 75% permanent loss of earning capacity. The trial court further found that the employer had underpaid the employee during the first 6 weeks of his period of temporary total disability but that it had overpaid him 39 weeks of temporary-total-disability benefits and $6,062.68 in short-term disability benefits. The trial court granted the employer a credit for those overpayments against the compensation awarded. In calculating the credit, the trial court determined that the employee was entitled to $220 per week in permanent-partial-disability benefits dating from March 29, 2005. The trial court divided $6,062.68 by $220 to find that the short-term disability benefits equaled 27.55 weeks of permanent-partial-disability benefits at $220 per week. The trial court reduced the payment period for permanent-partial-disability benefits from 300 weeks to 228 weeks to account for the 45 weeks of temporary-total-disability benefits paid and the 27 weeks of short-term disability benefits paid. The trial court then determined that the employee had been overpaid $8,822.37 as a result of his having received temporary-total-disability benefits at a rate of $455.91 per week during the permanent-partial-disability period when he should have received $220 per week. The trial court ordered that the employer could suspend payment for 47 additional weeks in order to recoup this overpayment “plus an additional seven (7) weeks to recovery [sic] attorney’s fees.”
*151 The employee filed a timely post-judgment motion that the trial court denied on December 15, 2006. The employee filed a timely notice of appeal to this court on January 5, 2007.

The Permanent-Total-Disability Issue

The employee initially argues that the trial court erred in failing to award him permanent-total-disability benefits. The employee asserts: (1) that he introduced competent evidence that should have reasonably satisfied the trial court that he was permanently and totally disabled; (2) that the trial court’s finding that the employee was not permanently and totally disabled was not supported by a preponderance of the evidence or substantial evidence; and (3) that the trial court’s findings are manifestly contrary to the weight of the evidence and that a fair-minded person in the exercise of impartial judgment would have come to a contrary conclusion.
We cannot address many of the employee’s arguments because of our limited standard of review. The determination of the extent of the employee’s disability is a discretionary function of the trial court. Dolgencorp, Inc. v. Hudson, 924 So.2d 727 (Ala.Civ.App.2005). It is not within the province of an appellate court to determine or establish the percentage of disability of an injured employee. Hill v. Stevens & Co., 360 So.2d 1035 (Ala.Civ.App.1978). Our review is restricted to a determination of whether the trial court’s factual findings are supported by substantial evidence. Ala.Code 1975, § 25-5-81(e)(2). This statutorily mandated scope of review does not permit this court to reverse the trial court’s judgment based on a particular factual finding on the ground that substantial evidence supports a contrary factual finding; rather, it permits this court to reverse the trial court’s judgment only if its factual finding is not supported by substantial evidence. See Ex parte M & D Mech. Contractors, Inc., 725 So.2d 292 (Ala.1998). A trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence. Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995). Thus, if substantial evidence supports a finding that the employee has sustained only a 75% permanent loss of earning capacity, this court may not reverse a judgment based on that finding even if the great weight of the evidence indicates that the employee has sustained a permanent total disability. See, e.g., Bradley v. Nelson, 507 So.2d 958 (Ala.Civ.App.1987); and Smith v. O’Neal Steel, Inc., 571 So.2d 1148 (Ala.Civ.App.1990).
In this case, substantial evidence supports the trial court’s determination that the employee sustained only a permanent partial disability. The record discloses that the employee was not restricted from completely using his right upper extremity but that he retained some of the use of his right arm for sedentary purposes, as the trial court found.[1] The employee had no other restrictions resulting from his right-shoulder injury. The employer’s human resources manager testified that the employer could accommo *152 date the employee’s medical restrictions and that the employer wanted the employee to return to work. The employer’s vocational expert indicated that the employee retained many attractive employment skills and identified job opportunities for the employee in his relevant labor market, opining that the employee sustained only a 34% loss of employability. The employee actually worked for a substantial period of time for the employer after his shoulder surgery and also obtained two different jobs after the first trial, all of which indicates that he was employable. Although it was undisputed that the employee had sustained a serious right-shoulder injury resulting in pain and a permanent physical disability that affected his ability to earn wages, substantial evidence indicated that this injury, even when coupled with the employee’s advanced age, did not completely eliminate the employee’s ability to find and be retrained for other gainful employment. See Ala.Code 1975, § 25-5-57(a)(4)d. (defining permanent total disability to include “any physical injury ... resulting from an accident, which ... permanently and totally incapacitates the employee from working at and being retrained for gainful employment”). Because substantial evidence supported the trial court’s disability finding, it is of no import that contrary evidence may be more credible and more probative, as the employee contends.
The employee correctly points out that in making its determination of the percentage of disability, a trial court is required to consider all the evidence and may not ignore undisputed evidence. See Fryfogle v. Springhill Mem’l Hosp., Inc., 742 So.2d 1255 (Ala.Civ.App.1998); Easterly v. Beaulieu of America, Inc., 717 So.2d 406 (Ala.Civ.App.1998). However, the employee fails to prove how those general principles apply to this case. In its original judgment, the trial court stated that it found “simply no competent evidence in this matter that establishes that [the employee] incurred an injury that would result in permanent total disability to him, taking into consideration his extensive work history and educational background.” The original judgment also did not set out in detail the testimony of the employee or his vocational expert. However, the trial court subsequently amended its order to completely summarize the testimony of the employee’s vocational expert, which evidence indicated that the employee was permanently and totally disabled. The court obviously considered that evidence and found it unpersuasive in light of the countervailing evidence, including evidence of the employee’s work history and educational achievement.
The employee also asserts that the trial court erred in relying exclusively on the fact that the employee worked at two jobs for what the employee contends was an insubstantial amount of time and an insubstantial amount of wages following the first trial. We need not address that argument because it is based on a false premise. The original judgment and the amended judgment reflect that the trial court considered all the evidence presented at both trials and did not focus exclusively on the employee’s job history following the first trial. The trial court indicated that it considered the employee’s posttrial employment as merely some evidence indicating that the employee could obtain and perform work, which is one of the factors affecting the extent of the employee’s loss of earning capacity. See Wilde v. Taco Bell Corp., 531 So.2d 918 (Ala.Civ.App.1988); and Ellenburg v. Jim Walter Res., Inc., 680 So.2d 282 (Ala.Civ.App.1996). Nothing in the trial court’s final judgment indicates that it presumed the employee was disqualified from receiving permanent- *153 total-disability benefits on account of the employee’s posttrial employment.
It appears that the employee is actually arguing that the trial court had no choice but to enter a permanent-total-disability award because the employee has not established a consistent and substantial earning record since he separated from the employer. However, under Alabama law, loss of earning capacity is not measured by comparing pre- and post-injury earnings. Southeastern Commercial Printing Corp. v. Sallas, 575 So.2d 1151 (Ala.Civ.App.1991). No Alabama case has ever held that the mere fact that the employee has earned less or no wages following an accident compels a finding of loss of earning capacity commensurate with the postinjury wages. See generally DeHart v. Ideal Basic Indus., Inc., 527 So.2d 136 (Ala.Civ.App.1988) (although employee earned 84% less after injury, trial court did not err in awarding 15% permanent-partial-disability benefits). The standard is not the employee’s actual earnings, but the employee’s actual earning ability. Ragland Brick Co. v. Campbell, 409 So.2d 443 (Ala.Civ.App.1982). In this case, the trial court had before it ample evidence other than evidence of the employee’s actual postinjury earnings that demonstrated that the employee retained a substantial ability to earn wages. Accordingly, we affirm that portion of the judgment awarding the employee permanent-partial-disability benefits based on a 75% loss of earning capacity.

The Calculation-of-Benefits Issue

The employee argues that the trial court made several errors in calculating the benefits due him. The employee first argues that the trial court incorrectly calculated the underpayment for the first six weeks of temporary-total-disability benefits. The employee asserts that the employer paid the employee $455.91 per week when it should have paid the employee $574.38 per week. However, the parties stipulated at trial that the employee should have been paid $518.92 during this period. The employee has presented no reason why this stipulation should not be binding on appeal. See Bowers v. Cotton Bayou Condos., 699 So.2d 166 (Ala.Civ.App.1997). Consequently, we find no error in the trial court’s conclusion that the employee was underpaid only $378.12.[2]
We also find that, contrary to the employee’s contention, the trial court did include this underpayment in its final determination. The final judgment indicates that the trial court applied this underpayment to the employer’s credit for overpaying the employee during the permanent-partial-disability period. The total overpayment was $9,200.49, but the trial court reduced this overpayment to $8,822.37 to account for the $378.12 underpayment.
The employee next argues that the trial court erroneously credited the employer for the short-term disability benefits it had paid the employee. Again, we disagree. Alabama Code 1975, § 25-5-57(c)(1), grants an employer a credit for the amount of sick-pay benefits paid to an employee. The amount in this case was stipulated to be $6,062.68. The trial court elected to credit this amount by dividing the total by $220, the amount of weekly permanent-partial-disability benefits due. See Ala.Code 1975, § 25-5-68(a). This calculation yielded 27.55 weeks of credit, which the trial court actually rounded down to 27 weeks. If anything, the trial court’s calculation benefited the employee.
*154 The employee finally argues that the trial court erred in failing to state the starting date for the payment of the employee’s benefits. However, the judgment clearly provides that the employer is to commence payment to the employee once all weekly credits have been satisfied. The employee has not cited any statute or case that requires the trial court to specifically state the commencement date in its order; hence, we will not place the trial court in error on this ground. See Fox v. Murrell, 622 So.2d 386 (Ala.Civ.App.1993).
Having concluded that the trial court did not commit any error in its calculation of benefits, we affirm that portion of the judgment.
AFFIRMED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. We note that the degree of the loss of vocational use of the employee's right upper extremity was subject to some dispute among the medical doctors and even some internal contradictions by individual doctors. The employee contends the trial court unduly weighed Dr. Anderson’s opinion; however, the trial court actually based its conclusion on Dr. Young's original restrictions, which basically coincided with the restrictions set out by Dr. Murphy. The trial court did not err in resolving this conflict by concluding that the employee still retained some use of his right arm, because that finding was supported by substantial evidence.

. Actually, the employee was only underpaid by $378.06 ($518.92-$455.91 = $63.01 x 6 = $378.06). However, since this mathematical error favors the employee, we find no ground for reversal.