On Application for Rehearing

BRYAN, Judge.
This court’s opinion of July 17, 2009, is withdrawn, and the following is substituted therefor.
G.A. West & Company (“G.A. West”) appeals from a judgment awarding Ricky McGhee permanent-total-disability benefits pursuant to the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala. Code 1975 (“the Act”). We affirm in part and reverse in part.
On August 16, 2004, McGhee began working for G.A. West as a welder and an iron worker. On the following day, McGhee was injured in a fall at work. In its judgment, the trial court made the following findings of fact concerning McGhee’s accident:
“McGhee was working with other iron workers in the process of dismantling some equipment as part of a ‘shutdown’ operation that was being conducted at the Alabama River Pulp mill in Monroe- *170 ville, Alabama. At the time of his injury, [McGhee] was working approximately thirty (30) feet off the ground on a catwalk. At that time, he was equipped with and wearing a safety harness with a double lanyard. At the particular moment of his injury, [McGhee] was unhooking his lanyard to move to a new location to begin further work with a cutting torch. Because of the distance to the new area where he was going to work, his safety lanyard would not allow him to be attached at the new location before he could unattach from the prior one. This was a process which was referred to as being ‘in transition’ by witnesses at trial. In the course of doing this, Mr. McGhee lost his footing and fell, sustaining severe injuries.”
Following the accident, G.A. West paid McGhee temporary-total-disability benefits through June 5, 2005. On June 27, 2005, G.A. West sued McGhee, alleging that a dispute had arisen between the parties regarding whether G.A. West owed McGhee any additional benefits under the Act. On February 26, 2008, the trial court held a trial, at which several issues were tried. On March 19, 2008, the trial court entered a judgment awarding permanent-total-disability benefits to McGhee. Following the denial of its postjudgment motion, G.A. West appealed to this court.
Section 25-5-81 (e), Ala.Code 1975, provides the standard of review in workers’ compensation cases:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
Substantial evidence is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).
“Our review is restricted to a determination of whether the trial court’s factual findings are supported by substantial evidence. Ala.Code 1975, § 25-5-81(e)(2). This statutorily mandated scope of review does not permit this court to reverse the trial court’s judgment based on a particular factual finding on the ground that substantial evidence supports a contrary factual finding; rather, it permits this court to reverse the trial court’s judgment only if its factual finding is not supported by substantial evidence. See Ex parte M & D Meek Contractors, Inc., 725 So.2d 292 (Ala.1998). A trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence. Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995).”
Landers v. Lowe’s Home Ctrs., Inc., 14 So.3d 144, 151 (Ala.Civ.App.2007) (opinion on original submission).
On appeal, G.A. West first argues that the trial court erred in determining McGhee’s average weekly earnings. Section 25-5-57(b), Ala.Code 1975, establishes methods for calculating an employee’s average weekly earnings. That section first provides:
“Compensation under this section shall be computed on the basis of the average weekly earnings. Average weekly earnings shall be based on the wages, as defined in Section 25 — 5—1(6)[, Ala.Code 1975,] of the injured employee in the employment in which he or she was *171 working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury divided by 52, but if the injured employee lost more than seven consecutive calendar days during the period, although not in the same week, then the earnings for the remainder of the period, although not in the same week, then the earnings for the remainder of the 52 weeks shall be divided by the number of weeks remaining after the time so lost has been deducted.”
Section 25-5-57(b) provides a second method for calculating average weekly earnings if an employee is injured after having worked for an employer for fewer than 52 weeks:
“Where the employment prior to the injury extended over a period of less than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed, provided results just and fair to both parties will thereby be obtained.”
Section 25-5-57(b) also provides a third method for calculating average weekly earnings:
“Where by reason of the shortness of the time during which the employee has been in the employment of his or her employer or the casual nature or terms of the employment it is impracticable to compute the average weekly earnings as above defined, regard shall be had to the average weekly amount which during the 52 weeks prior to the injury was being earned by a person in the same grade, employed at the same work by the same employer, and if there is no person so employed, by a person in the same grade employed in the same class of employment in the same district.”
This court has stated:
“[T]he employee has the burden of presenting evidence for computation of his average weekly wage. Cook Transports, Inc. v. Beavers, 528 So.2d 875 (Ala.Civ.App.1988)- [If] the formulas for determining average weekly earnings set out [in § 25-5-57(b) ] are impracticable to apply in a particular case so as to arrive at a just and fair result to both parties, much must be left to the sound judgment and judicial discretion of the trial court. Unexcelled Mfg. Corp. v. Ragland, 52 Ala.App. 57, 289 So.2d 626 (1974); Aluminum Workers Int'l v. Champion, 45 Ala.App. 570, 283 So.2d 511 (1970).”
Stevison v. Qualified Pers., Inc., 571 So.2d 1178, 1180 (Ala.Civ.App.1990).
At trial, McGhee, who had the burden of presenting evidence establishing his average weekly earnings, testified that he was hired by G.A. West to work on a project (“the project”) involving the shutting down of a pulp mill. McGhee testified that he was not a regular employee of G.A. West. McGhee’s hourly wage was $16.50. As noted, McGhee was injured during his second day of employment with G.A. West. A document admitted into evidence at trial indicated that McGhee was paid by G.A. West for working 10 hours daily for 2 days.
Jason Ward, an iron worker who worked with McGhee for G.A. West, testified at trial. Ward testified that McGhee was injured during the beginning of the “pre-down” phase of the project. Ward stated that the pre-down phase lasted approximately a month and that he worked 10 hours a day for 5 days a week during that period. Ward testified that the pre-down phase was followed by a “shutdown” phase that lasted approximately a month. Ward stated that, during the shutdown phase, he worked 12 hours a day for 7 days a week.
*172 In its judgment, the trial court stated:
“[Section] 25-5-57(b) ... sets forth the manner in which the average weekly wage is to be calculated. However, none of the scenarios outlined in that statute fit the facts of this case because of the fact that Mr. McGhee was injured on the second day of the work, and after the project had only begun. Therefore, in keeping with the case of Slay Transportation Company, Inc. v. Miller, 702 So.2d 142 (Ala.Civ.App.1997), the court finds that the most equitable means of arriving at the appropriate average weekly wage is to use a combination of the wages paid to Mr. McGhee for the two days which he worked and the testimony from Mr. Ward documenting the wages he would have earned but for the injury. Under that analysis, the court hereby finds that Mr. McGhee’s average weekly wage on the date of his injury was $1,328.25....”
Because McGhee had worked fewer than 52 weeks for G.A. West before his injury, the first method prescribed by § 25-5-57(b) is clearly inapplicable. Both McGhee and G.A. West contend that using the second method found in § 25-5-57(b) would be inequitable because McGhee worked for only two days for G.A. West. G.A. West argues that the trial court erred by not applying the third method found in § 25-5-57(b). McGhee argues that, because he was injured soon after beginning work on a specific project, it would be inequitable, in calculating McGhee’s average weekly earnings, to rely on the earnings of a welder/iron worker accumulated during the 52-week period immediately before McGhee’s injury.
Our supreme court has discussed the application of the third method found in § 25 — 5—57(b):
“It must be noted that so much of the provision as deals with cases falling under [the third method] does not make it a hard and fast rule on the trial court to award the same wages or earnings as those earned by others there referred to. It simply requires that the court must have ‘regard’ to such average weekly earnings of others in making an award in the instant case, but does not mean that the amount fixed must be identical to the weekly earnings of the others. In other words, it must be regarded as an evidential, though not conclusive, factor, in the ascertainment of the award in hand, taking into consideration, of course, any physical differences such as the interruption or constancy in the respective employments.”
Garrison v. Woodward Iron Co., 210 Ala. 45, 46, 97 So. 64, 64 (1923).
In arguing that the third method should be applied, G.A. West focuses on a document purporting to show the earnings of an unnamed iron worker who had worked for G.A. West during the 52-week period preceding McGhee’s accident. The only indication on the document that the employee is an iron worker is the handwritten notation “Iron Worker” at the top of the document. Like McGhee, the unnamed employee earned $16.50 per hour. The document indicates that the employee earned $37,759.67, or a weekly average of $726.15, during the 52-week period before McGhee’s accident.
When counsel for G.A. West sought to admit the document at trial, counsel for McGhee objected, stating: “I don’t think there’s been any proper foundation laid that he’s a similar employee [to McGhee], I don’t know who this employee was. We don’t know what the job was....” The trial court initially sustained the objection to the document. However, the trial court later admitted the document over the con *173 tinued objection of McGhee’s counsel. When the trial court admitted the document, the trial court stated:
“I’m going to admit [the document] on the grounds of what you have just now raised[, ie., to show the work activity at the mill,] but I’ll make it real clear, I’m admitting it, but I’ll be [the] gauger of the weight to give it- I’m not going to give it very much weight because ... you just grabbed one employee out of the pot and it may be indicative of that to some extent, it may have some bearing on this, so it would be something that I would look at[.] [B]ut I’ll have to determine as I study it and think through and compare it to the other evidence as to how much weight I’m going to give it.”
The third method prescribed by § 25-5-57(b) requires the trial court to “regard” the average weekly earnings of an employee similarly situated to McGhee. The trial court, in computing McGhee’s average weekly earnings, indicated that it would consider the document showing the earnings of an employee purportedly similarly situated to McGhee. However, the trial court, concerned that that employee’s work may not accurately reflect the work that McGhee performed and would have performed for G.A. West, evidently assigned the document very limited weight. Under the third method found in § 25-5-57(b), although a trial court must consider evidence of the average weekly earnings of a similarly situated employee, that evidence is not conclusive. Garrison, 210 Ala. at 46, 97 So. at 64. As noted, a trial court may depart from the methods prescribed by § 25 — 5—57(b) if those methods fail to produce a just and fair result. Stev-ison, 571 So.2d at 1180. In such situations, much must be left to the discretion of the trial court in determining an employee’s average weekly earnings. Id. Given the facts of this case, the trial court did not err in deviating from the methods found in § 25-5-57(b) in determining McGhee’s average weekly earnings.
Although the trial court did not err in deviating from the methods prescribed by § 25-5-57(b), we cannot affirm the trial court’s calculation of McGhee’s average weekly earnings. The amount determined by the trial court to be McGhee’s average weekly earnings — $1,328.25—appears to be an amount closer to McGhee’s maximum possible weekly earnings than his actual average weekly earnings.
McGhee testified that he was hired by G.A. West to work on the project and that he was not a regular employee of G.A. West. McGhee further testified:
“Q. [By counsel for G.A. West:] ... [B]efore you went to work with G.A. West, it was your practice to work shutdowns for companies, right?
“A. Yes, sir. And we—
“Q. You’d work a few weeks here and few weeks there?
“A. Yes, sir.
“Q. And you had periods—
“A. Yes, sir.
“Q. —Prior to going to work for G.A. West where you were out of work for extended periods of time?
“A. Yes, sir.”
The trial court calculated McGhee’s average weekly earnings to be $1,328.25. That amount indicates the average weekly wage that McGhee would have earned during the project, which lasted two months, had he not been injured. However, that amount does not appear to reflect the average weekly earnings that McGhee would have earned over the course of a year working as a welder and an iron worker. McGhee agreed that he was unemployed for “extended periods of time” before *174 working for G.A. West and that he would “work a few weeks here and few weeks there.” He also acknowledged that he was hired by G.A. West specifically to work on the project. McGhee’s testimony suggesting that he was sporadically employed as a welder and an iron worker is inconsistent with the trial court’s determination that McGhee’s average weekly earnings are $1,328.25. That amount represents an average 67-hour work week — 40 regular hours and 27 overtime hours — at McGhee’s hourly wage of $16.50. The calculation of the average weekly earnings should determine the amount that the employee has lost due to the injury. See Ex Parte Murray, 490 So.2d 1238, 1241 (Ala.1986). Although the trial court’s calculation of McGhee’s average weekly earnings accurately reflects the earnings that McGhee lost during the duration of the project, the record does not indicate that the trial court’s calculation accurately reflects the earnings that McGhee could be expected to lose over the course of an entire year. Accordingly, we must reverse that part of the judgment determining McGhee’s average weekly earnings.
G.A. West also argues that the trial court erred in determining that McGhee is permanently and totally disabled.
“ ‘Permanent total disability’ is defined in § 25-5-57(a)(4)d., Ala.Code 1975, to include ‘any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment.’ Total disability does not mean absolute helplessness; rather, it means that the employee is not able to perform his or her trade and is unable to obtain other reasonably gainful employment.”
Dolgencorp, Inc. v. Hudson, 924 So.2d 727, 734 (Ala.Civ.App.2005). ‘“[G]ainful employment means employment similar in remuneration to that earned prior to the injury. Implicit in this is that the gainful employment sought to be restored must be “suitable.” By “suitable” we mean employment which is compatible with the employee’s pre-injury occupation, age, education, and aptitude.’ ” Trans Mart, Inc. v. Brewer, 630 So.2d 469, 471 (Ala.Civ.App.1993) (quoting Ex parte Beaver Valley Corp., 477 So.2d 408, 412 (Ala.1985)).
McGhee was 54 years old at the time of the trial. McGhee testified that he completed the 10th or 11th grade of high school and that he later obtained a GED. McGhee testified that he served in the United States Navy for approximately four years after obtaining his GED. McGhee subsequently attended trade school, where he trained to be a welder. McGhee had worked as a welder and an iron worker for over 20 years before his accident.
As a result of his fall at work, McGhee sustained a fractured right orbital socket, a fractured right nasal bone, a fractured right maxillary sinus, a closed-head injury, and a fractured right wrist. The trial court made the following findings of fact concerning the effects of McGhee’s injuries:
“14. Following his initial injury, Mr. McGhee received medical treatment from numerous medical providers, including Dr. Thomas Barbour (orthopae-dist), Dr. Stephen Slobodian (physical medicine and rehabilitation), Dr. John Hutcheson (neuropsychologist) and Dr. R. Scott Benson (psychiatrist).
“15. Dr. Barbour performed two different surgeries on Mr. McGhee.... At the end of his treatment, Dr. Barbour expressed the opinion that Mr. McGhee had sustained a seven (7%) percent impairment to the right upper extremityf. *175 Dr. Barbour assigned McGhee] restrictions of no heavy gripping, no repetitive gripping and no repetitive lifting over fifteen (15) pounds with the right arm.
“16. Dr. Stephen Slobodian began treating Mr. McGhee on January 28, 2005. He ordered an MRI on February 10, 2005[,] which objectively demonstrated clear evidence of an injury to the right side of the brain.
“17. ... Dr. Slobodian placed Mr. McGhee at maximum medical improvement on September 22, 2005[. Dr. Slo-bodian] assigned a total nine (9%) percent impairment to the body as a whole, which consisted of a combination of the five (5%) percent assigned to him as a result of the closed head injury and the seven (7%) assigned by Dr. Barbour pertaining to the right arm injury.
“18. In addition, Dr. Slobodian testified that Mr. McGhee will have lifetime difficulties with cognitive functioning as a result of his closed head injury, and that he will not be able to think as well beforehand, will not be able to follow directions as well and will have trouble with calculations. Additionally, Dr. Slo-bodian noted that Mr. McGhee was suffering from severe depression, for which he referred him to Dr. John Hutcheson.
[[Image here]]
“20. Dr. Hutcheson evaluated Mr. McGhee at the specific request of Dr. Slobodian because of his expertise in treating patients with closed head injuries. [Dr. Hutcheson] stated that Mr. McGhee suffered from a severe depression and that, as a result of that depression, he did not believe that Mr. McGhee was capable of returning to gainful employment.
“21. Dr. Hutcheson further testified that the recognized pattern is that Mr. McGhee’s condition will worsen instead of improving as he gets older.
“28. ... McGhee offered vocational testimony from an expert retained by him, Mr. Joseph Miller. Mr. Miller testified that as a result of Mr. McGhee’s injuries, the restrictions assigned to him by the various treating physicians, Mr. McGhee’s past work experience, age, educational level and vocational aptitudes, ... it is his opinion that Mr. McGhee is one hundred (100%) percent totally disabled from the vocational standpoint. Mr. Miller has had extensive experience working with patients with closed head injuries, of which the court takes note and finds particularly relevant to this case. Pertinent to that, the matters testified to by Dr. Slobodian regarding Mr. McGhee’s inability to concentrate, problems with processing information, forgetfulness, and temper outbursts consistent with personality changes from the closed head injury all constitute significant obstacles toward any other attempts to return Mr. McGhee to gainful employment. When all of this is coupled with the opinions of Dr. John Hutcheson regarding Mr. McGhee’s severe depression, Mr. Miller was clearly of the opinion that Mr. McGhee is one hundred (100%) percent vocationally disabled. The court finds this testimony in keeping with the totality of the evidence in this case, and specifically adopts that opinion.”
In its judgment, the trial court also stated that it considered the expert testimony of Tom Christianson, a vocational-rehabilitation counselor. Christianson identified several jobs that he believed McGhee could perform. However, the trial court found the testimony of Joseph Miller, McGhee’s vocational expert, to be more convincing than Christianson’s testimony. Although the record contains some evidence suggesting that McGhee is less than *176 permanently and totally disabled, “a trial court’s findings of fact based on conflicting evidence are conclusive on this court if they are supported by substantial evidence.” Landers, 14 So.3d at 146. Given the evidence before the trial court, the trial court’s finding that McGhee is permanently and totally disabled is supported by substantial evidence. That is, a fair-minded person in the exercise of impartial judgment could reasonably infer that McGhee is permanently and totally disabled. Ex parte Trinity Indus., Inc., supra. Accordingly, the trial court did not err in its determination of McGhee’s degree of disability. § 25-5-81(e), Ala.Code 1975.
G.A. West also argues that the trial court erred in determining that McGhee did not willfully violate a safety rule by failing to have his safety lanyard securely attached when he fell. McGhee was in the process of disconnecting his lanyard from one location and attaching it to another location when he fell. A finding of willful misconduct precludes an injured employee from recovering under the Act. Section 25-5-51, Ala.Code 1975, provides, in pertinent part, that “no compensation shall be allowed for an injury ... caused by the willful misconduct of the employee ... [or caused by] his or her willful failure or willful refusal to use safety appliances provided by the employer....” Willful misconduct is an affirmative defense. Ex parte Bowater, Inc., 772 So.2d 1181, 1181-82 (Ala.2000).
G.A. West also argues that McGhee refused to undergo vocational rehabilitation or to accept reasonable accommodation. Section 25-5-57(a)(4)(d), Ala.Code 1975, provides, in pertinent part, that “[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo ... vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled.”
G.A. West did not plead either the defense of willful misconduct or the defense of refusal of vocational rehabilitation or reasonable accommodation. At the beginning of the trial, counsel for G.A. West stated that he would be presenting those defenses during the trial. At that time, counsel for McGhee objected to the trial of those issues, stating:
“As far as refusing employment, the first I’ve heard of that ... is one minute ago when [counsel for G.A. West] just identified it to you as a possible issue.
[[Image here]]
“... As far as [a possible] violation of the safety rules, [the] first I heard of that was six days ago when [counsel for G.A. West] called me about making arrangements to take the deposition of Mr. Billy Black who was the safety director on the job site. We made arrangements and took his deposition. However, I have had no prior knowledge of that as being a defense in this case and have had no opportunity to try to explore that possibility. There’s an individual named Mr. Mack Morris who was [McGhee’s] supervisor on the job that I was able to contact last night, who I was able to speak with. He said he was a superintendent on a job in Mobile and was not able to be here at trial today. As Your Honor pointed out ... this case [has] been pending almost three years. This issue has never been raised by [G.A. West].”
The trial court decided to try the issues of willful misconduct and refusal of vocational rehabilitation or reasonable accommodation over the objection of McGhee’s counsel.
G.A. West contends that its complaint placed McGhee on notice of the issues of willful misconduct and refusal of vocational *177 rehabilitation or reasonable accommodation. However, G.A. West’s complaint broadly alleged that a dispute had arisen regarding whether G.A. West owed McGhee any additional benefits under the Act and sought a judgment “resolvfing] all controversies in this action in [G.A. West’s] favor.” McGhee was unaware that G.A. West would be asserting the willful-misconduct defense until shortly before trial. McGhee first discovered that G.A. West would be asserting the defense of refusal of vocational rehabilitation or reasonable accommodation on the day of the trial. At the time of the trial, the case had been pending for approximately 32 months. Given those facts, we conclude that McGhee would be substantially prejudiced if we were to reverse the judgment of the trial court based on either of those two issues. Accordingly, we do not address those issues further.
G.A. West also argues that, pursuant to § 25-5-77(b), Ala.Code 1975, the trial court erred in awarding benefits because, G.A. West says, McGhee refused to accept reasonable medical treatment. However, G.A. West did not present this argument to the trial court. “[An appellate court] cannot consider arguments advanced for the purpose of reversing the judgment of a trial court when those arguments were never presented to the trial court for consideration or were raised for the first time on appeal.” State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 821 (Ala.2005). Therefore, we do not address that argument further.
We reverse the judgment of the trial court insofar as it determined McGhee’s average weekly earnings to be $1,328.25. In all other respects, we affirm the judgment of the trial court.
APPLICATION FOR REHEARING GRANTED; OPINION OF JULY 17, 2009, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J., recuses himself.