PER CURIAM.
Patricia Holloway was employed by Sha-descrest Health Care Center (“Shades-crest”) as a certified nursing assistant (“CNA”). In January 2001, Holloway slipped on a puddle of water and fell, injuring her back. Holloway informed her supervisor of the fall. She did not undergo medical treatment provided by her employer between the date of the injury and October 2002. However, in October 2002, Holloway sought treatment from an employer-selected physician, Dr. Scott Twil-ley, who then referred Holloway to Dr. Mark Prevost. In April 2003, after more conservative treatments had not resolved Holloway’s continued back pain and intermittent shooting pains in her right leg, Dr. Prevost performed a lumbar-fusion surgery on Holloway. Although the surgery resolved Holloway’s intermittent leg pain, her back pain continued.
Holloway underwent physical therapy after her surgery. She also underwent a functional capacities evaluation (“FCE”) in September 2003. Holloway explained that the FCE took about an hour and that it was difficult to complete due to her pain. However, she said that she performed the tasks requested of her, including walking up and down some steps, picking up a basket, and squatting. Holloway testified that bending over during the FCE put a strain on her back and that, although she had performed the squatting requested, she recalled that an attendant had to help her stand back up. According to Holloway, she felt more sore later that afternoon and the next day than she usually felt.
After the FCE, Holloway was released to return to work by Dr. Prevost, with certain restrictions established by the FCE. Specifically, she was permitted to lift frequently up to 20 pounds and to *150 carry loads of 20 to 25 pounds for short distances frequently. She was limited to occasionally climbing stairs or ladders, balancing, kneeling, crouching, and squatting. The FCE placed no limitation on Holloway’s ability to reach, handle objects, or use her fingers. However, the FCE did state that Holloway should completely avoid stooping, which it defined as “[blending the body downward and forward by bending the spine at the waist.”
In November 2003, Holloway attempted to return to work as a CNA for Shades-crest, which had modified her position by limiting Holloway to certain duties that, it said, were within her restrictions. Holloway was limited to taking blood-pressure readings, washing out soiled linens, and feeding patients. She performed her restricted duties for two nights; however, when she awoke the morning after her second shift, Holloway said, she “couldn’t hardly walk” and she telephoned her supervisor to report that she could not perform her duties and would not be returning to work. Holloway explained that she had had difficulty taking some patients’ blood-pressure readings because the beds were positioned very low and she had to bend over and lean down to perform that function. She also noted that she could not better position her patients because she could no longer move patients by rolling them as she could before her injury and surgery. She further complained that she was not allowed to take frequent breaks as she needed them.
In addition to testifying about the impact of her back injury, surgery, and residual pain on her ability to perform her work duties, Holloway testified that her pain impacted her daily activities as well. Holloway said that her pain was constant and that it was generally between 6 and 8 on a 10-point scale, with 10 being the worst pain. She explained that she could stand in one place for approximately 30 to 40 minutes before she needed to sit or lie down to rest for approximately 20 to 30 minutes.
Holloway is being treated for her pain by Dr. David Cosgrove, a pain-management specialist. Holloway takes Norco, a narcotic pain medication, Skelaxin, a muscle relaxer, and Celebrex, a nonsteroidal anti-inflammatory medication used to treat arthritis. She has also taken Soma, another muscle relaxer, which she reported had given her nightmares, methadone, another narcotic pain reliever, and has been prescribed a transcutaneous electrical nerve stimulation (“TENS”) unit.
Holloway said that her typical day began between 6:00 and 7:00 a.m., when she would awaken and fix breakfast. She said that, after fixing breakfast, she would sit and eat and watch television for a time and that she would later return to the kitchen to wash the breakfast dishes. After washing the dishes, Holloway said, she would then sit or recline for a time. Holloway said that she would do other tasks, like laundry, as needed, between intervals of sitting or reclining. Making a bed or sweeping and mopping, explained Holloway, hurt her back, so she was limited in performing those activities. Holloway explained that if she rested between activities, her pain would sometimes recede to about 5 on the 10-point scale.
According to Holloway, she no longer gardens, an activity that she once enjoyed. She also testified that she could drive but that she could not remain seated behind the wheel of the automobile for more than 45 minutes without needing to change position. She said that she does perform grocery shopping, provided, she stated, that the trip does not exceed 30 to 45 minutes. Holloway admitted that she did sometimes carry grocery bags as heavy as 10 to 15 pounds from her automobile into her *151 house. She explained that, at times, she could carry the bags only to the door or that, if someone else were home, that person would assist her by bringing the groceries inside.
Holloway also testified that her pain interfered with her sleep patterns. She said that she went to bed at around midnight each night only to sleep for three to four hours before being awakened by her pain. She said that she might be awake for a time before dozing off for another hour or two of sleep. As a result, Holloway said, the pain and lack of sleep affected her ability to concentrate and caused her to feel mentally stressed.
Dr. Prevost testified that he had performed the lumbar-fusion surgery on Holloway. He explained the procedure and discussed Holloway’s recovery from the surgery. According to Dr. Prevost, the surgery went well and he was able to fuse the L4-L5 and L5-S1 vertebrae, which, he said, was like tricking them to grow together. He noted that Holloway also required the insertion of some screws to stabilize the vertebrae. Dr. Prevost commented that he was able to free up the nerve that was being impinged, resulting in the eradication of the shooting right-leg pains that had plagued Holloway.
Over the several weeks following the surgery, Dr. Prevost said, he saw Holloway for periodic follow-up appointments. He noted that Holloway had reported at her six-week follow-up appointment that she had no leg pain but that she still had back pain; Dr. Prevost indicated that continued back pain was appropriate at that stage of Holloway’s recovery. In July 2003, Dr. Prevost saw Holloway and noted that she was healing well and that she “was getting a nice, solid fusion.” Dr. Prevost noted, after being questioned, that he had been slowly weaning Holloway off of narcotic pain medications since the surgery, having prescribed decreasing doses of Lortab. Dr. Prevost said that his notes from Holloway’s August 2003 follow-up appointment indicated that Holloway reported increased back pain at that appointment. Dr. Prevost said that he ordered Holloway to undergo an FCE, which she did; Dr. Prevost placed Holloway at maximum medical improvement on September 18, 2003, and he released her to return to work within the restrictions contained in the FCE.
When questioned about whether Holloway’s light-duty CNA position appeared consistent with the restrictions placed on Holloway by the FCE, Dr. Provost answered in the affirmative. He noted, however, that Holloway reported continued back pain and that, in his opinion, Holloway’s pain was real and she was credible in her reports to him. Dr. Prevost further stated that, despite the fact that the FCE indicated that Holloway could physically perform certain tasks and therefore would be able to work, “she may not be able to work.”
Two vocational-rehabilitation counselors testified at trial: William A. Crunk, who testified on behalf of Holloway, and Beth D. Holt, who testified on behalf of Shades-crest. Crunk testified that he had concluded that Holloway had suffered a 100% loss of earning capacity. Holt, however, testified that Holloway had suffered only a 30% loss of earning capacity.
Crunk testified that he had interviewed Holloway on November 5, 2003, and that he had prepared his report on January 12, 2004. He opined that, based on Holloway’s suffering constant, moderately severe pain, Holloway had suffered a 100% loss of earning capacity. Crunk explained that he had considered Holloway’s lumbar-fusion surgery, her continued complaints of pain, her statements regarding how her pain affected her, and her ninth grade *152 education in making his determination that Holloway was 100% vocationally disabled. According to Crunk, Holloway’s surgery and subsequent residual pain affects her ability to perform an 8-hour workday for a 40-hour workweek. Crunk admitted that Holloway could perform certain tasks consistent with her FCE; however, he noted that Holloway could perform those tasks only for short periods before needing to rest her back and that her need for frequent rest periods would not be consistent with any full-time employment status.
After he compiled his report, Crunk had a chance to review Dr. Prevost’s deposition, Holloway’s medical records from Dr. Cosgrove, and a Social Security disability decision favorable to Holloway.[1] He stated that the information contained in those documents was consistent with and supported his conclusion that Holloway was 100% vocationally disabled. He noted that Holloway had been diagnosed by Dr. Cos-grove as suffering from “chronic, intractable non-malignant pain” and that she had been on “pretty significant” medications to control her pain, including methadone. Crunk agreed that if Holloway’s pain was managed, she would be a candidate for vocational-rehabilitation services; however, he noted that the focus of his evaluation was whether Holloway was able to consistently work an 8-hour day for a 40-hour workweek, despite her pain, which, he said, Holloway was not able to do.
Holt testified that when determining a disability rating or performing a vocational assessment, she considered work history, educational level, medical history, vocational testing, and that she conducted an interview with the employee. She explained that she had concluded, based on all the information she normally considered, that Holloway had suffered a 30% loss of earning capacity. Holt noted that the results of Holloway’s FCE indicated that she should be able to perform at least light-duty work; specifically, Holt noted that nothing in the FCE indicated that Holloway would not be able to perform those tasks assigned to her when she returned to the light-duty CNA position provided to her by Shadescrest. Holt testified that Holloway would be a good candidate for vocational rehabilitation with proper pain management. She said that many patients are able to effectively manage pain levels in the “6 range” like that suffered by Holloway. However, when questioned further about Holloway’s testimony that she needed to lie down several hours a day, Holt admitted that her opinion “might” be impacted by that fact; Holt clarified that she would still like to see efforts at rehabilitation made in such a circumstance. Holt then admitted that, if an individual is unable to effectively manage chronic pain and could not be rehabilitated or reconditioned, it was possible that the person would not be able to maintain full-time employment.
In January 2003, Holloway sued Shades-crest, seeking workers’ compensation benefits. After a trial in May 2006, the trial court entered a judgment finding Holloway permanently and totally disabled and awarding benefits accordingly. Shades-crest appeals, arguing that, pursuant to Ala.Code 1975, § 25-5-57(a)(4)d., Holloway is precluded from being declared permanently and totally disabled because she refused reasonable accommodation and vocational rehabilitation provided by Shades-crest. Shadescrest also argues that the *153 trial court’s determination that Holloway is 100% permanently and totally disabled is not supported by substantial evidence.
The trial court’s judgment makes several pertinent factual findings. Chief among those findings is the finding that Holloway’s “injuries have left her severely restricted and limited not only in her ability to work, but [in] her ability to fully conduct her activities of daily living.” The trial court determined that Holloway “suffers from chronic and debilitating pain,” found Holloway’s testimony “totally credible,” was impressed with Holloway’s “candor and genuineness,” and found her “demeanor and appearance in open court ... consistent with her complaints of chronic, debilitating pain.” Based on its finding that Holloway suffered from chronic, debilitating pain and its determination that Crunk’s testimony that Holloway suffered a 100% loss of earning capacity was also “credible and supported by the other evidence” at trial, the trial court determined that Holloway “is not a candidate and could not be considered a candidate for vocational rehabilitation” and that she is “permanently and totally disabled from sustaining any substantial, gainful employment.”
Shadescrest argues that the trial court was precluded from concluding that Holloway was permanently and totally disabled because, it says, § 25-5-57(a)(4)d. excludes “[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation” from being considered permanently and totally disabled.[2] Because Shadescrest failed to assert those arguments in the trial court, we are precluded from considering them on appeal. See McGinnis v. Jim Walter Homes, Inc., 800 So.2d 140, 145-46 (Ala. 2001). The only argument presented to the trial court at trial and in Shadescrest’s postjudgment motion was that Holloway was a candidate for vocational rehabilitation, not that she had been offered vocational rehabilitation and refused it. Thus, we will not consider Shadescrest’s argument that the exclusions in § 25-5-57(a)(4)d. precluded a determination that Holloway was permanently and totally disabled.
Shadescrest further argues that the trial court’s determination that Holloway is permanently and totally disabled is not supported by substantial evidence. Shadescrest argues that the only direct evidence of Holloway’s inability to work is her own “self-serving” testimony and that it presented substantial evidence in support of its contention that Holloway was able to work after her recovery from her lumbar-fusion surgery.
“The determination of the extent of the employee’s disability is a discretionary function of the trial court. Dolgencorp, Inc. v. Hudson, 924 So.2d 727 (Ala.Civ.App.2005). It is not within the province of an appellate court to determine or establish the percentage of disability of an injured employee. Hill v. [J.P.] Ste *154 vens & Co., 360 So.2d 1035 (Ala.Civ.App.1978). Our review is restricted to a determination of whether the trial court’s factual findings are supported by substantial evidence. Ala.Code 1975, § 25-5-81(e)(2). This statutorily mandated scope of review does not permit this court to reverse the trial court’s judgment based on a particular factual finding on the ground that substantial evidence supports a contrary factual finding; rather, it permits this court to reverse the trial court’s judgment only if its factual finding is not supported by substantial evidence. See Ex parte M & D Mech. Contractors, Inc., 725 So.2d 292 (Ala.1998). A trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence. Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995).”
Landers v. Lowe’s Home Ctrs., Inc., 14 So.3d 144, 151 (Ala.Civ.App.2007).
Shadescrest specifically relies on a statement in Holt’s vocational-disability report that indicates that Holloway chose not to work because “a lawyer told her not to” and Holloway’s earlier failure to cooperate with medical treatment offered by Shades-crest.[3] These facts, urges Shadescrest, should have cast doubt on the “self-serving” testimony offered by Holloway at trial. Although such facts might well impact a trier of fact weighing the evidence, the trial court determined that Holloway’s complaints of pain and her reported inability to work were credible in light of the totality of the evidence presented. The mere existence of evidence that might serve as a basis to question Holloway’s credibility does not require reversal of the trial court’s judgment, because “[i]t was the function of the trial court, as the finder of fact, to determine the credibility of [Holloway’s] testimony and to assign relative weight to that testimony.” Millry Mill Co. v. Manuel, 999 So.2d 508, 519 (Ala.Civ.App.2008).
As further support for its argument that the trial court’s judgment should be reversed because it is not supported by substantial evidence, Shadescrest points to substantial evidence in the record that would support a conclusion that Holloway could return to work after her recovery from surgery and that the light-duty CNA position Shadescrest offered to her met her restrictions. Shadescrest specifically relies on the FCE results, which, it says, indicate that Holloway could perform the tasks assigned to her in the light-duty CNA position. Shadescrest further contends that Dr. Prevost agreed with the FCE results and with the proposition that the light-duty CNA position met those restrictions, thus proving, it urges, that Holloway is not permanently and totally disabled. Finally, Shadescrest argues that the testimony of both Crunk and Holt supports a conclusion that Holloway is a candidate for vocational rehabilitation.
However, although one view of the evidence relied on by Shadescrest might well have supported a conclusion that Holloway has the physical ability to perform the tasks assigned her in the light-duty CNA position created for her by Shadescrest, other evidence in the record supports the trial court’s ultimate conclusion that Holloway’s chronic and debilitating pain prevent her from being able to maintain gainful employment. Dr. Prevost agreed that the FCE might indicate that Holloway could perform certain tasks, but he also stated that Holloway still might not be able to work because of her pain and the affect it has on her. Crunk testified that Hollo *155 way’s unmanaged pain prevented her from being able to work an 8-hour day and a 40-hour workweek, resulting in permanent and total vocational disability. Holloway’s testimony, which the trial court expressly found to be credible, explained that she could do certain tasks for limited periods before needing to lie down and rest to manage her pain. Thus, although substantial evidence in the record might well have supported a judgment in favor of Shades-crest, our review of all the evidence of record, with the attendant presumption in favor of the trial court’s findings of fact based on conflicting evidence, convinces us that the trial court’s judgment was supported by substantial evidence and should be affirmed. See Landers, 14 So.3d at 151.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.
THOMAS, J., concurs in part and dissents in part, with writing.

. Although Holloway offered into evidence her favorable Social Security disability decision, the trial court refused to admit it over Shadescrest’s objection. We have not reviewed or considered the decision in our preparation of this opinion, but we have included Crunk's reference to it because that testimony was not excluded.

. Section 25-5-57(a)(4)d. provides:
"The total and permanent loss of the sight of both eyes or the loss of both arms at the shoulder or any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment, shall constitute prima facie evidence of permanent total disability but shall not constitute the sole basis on which an award of permanent total disability may be based. Any employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled.”

. We assume that Shadescrest is referring to the fact that Holloway did not seek treatment for her back injury until October 2002, 22 months after her January 2001 injury.